UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | NO. 0101 1:24CR10074-1 |
| | ) | |
| JOHN DERVING MURPHY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

## I.    INTRODUCTION

John D. Murphy respectfully submits this memorandum to assist this Honorable Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a) in light of *United States v. Booker*, 125 S. Ct. 738 (2005).

*Booker* restored this Honorable Court's ability to fashion a sentence tailored to the individual circumstances of the case and the defendant by requiring courts to consider factors other than the sentencing range prescribed by the United States Sentencing Guidelines. Indeed, under Section 3553(a), courts are *required* to sentence *below* the range if such a sentence would be sufficient to achieve the purposes of punishment.

### a.    *Statement of facts*

On June 14, 2021, just shy of three years before the indictment was filed in the instant case, the defendant received a phone call in his Hanson, Massachusetts home from a man referred to in

this case as "a New York-based dogfighting target". The man was familiar to the defendant, but he had not been in contact with him for many years. The subject matter was historical dogfighting and breeding. This call was recorded by law enforcement as part of a state investigation relative to a target out of Suffolk County, New York. Law enforcement noted this recorded conversation consisted of breeding, results of undated dogfights, as well as injuries sustained by various dogs. New York state authorities conveyed this information to federal authorities at the Office of Inspector General for the United States Department of Agriculture (USDA-OIG) in Massachusetts.

Over the course of the next ten months, from August of 2022 to May of 2023, unbeknownst to the defendant, federal law enforcement would actively surveil Mr. Murphy, including with a pole camera outside Mr. Murphy's residence as well as through physical surveillance and even helicopter aerial surveillance. Mr. Murphy has pled guilty to Possessing Animals for Use in an Animal Fighting Venture. Nonetheless, apart from possessing the animals, this surveillance would reveal nothing beyond the defendant's leaving his home for work at 4:30 a.m. every morning for work each day (as pointed out by the agent in this case), with no indication of traveling, arranging or participating in any dogfighting events during the period of the investigation.

Nearly two years after the June 14, 2021, phone call, on June 7, 2023, around 4:00 a.m. just before the defendant was about to leave for work as a Union glazier, federal and local law enforcement arrived at his residence, which he shares with his partner Tiffany Lane and their 9-year-old daughter, and searched it pursuant to a federal search warrant. As a result of the search, law enforcement seized nine dogs from their 10-foot by 10-foot outdoor housing structures as

well as various medical supplies, scales, treadmills, and pet paraphernalia (leashes, collars, etc.). John's cell phone and social media was also searched pursuant to a warrant.

John's 9-year-old daughter Niamh was also removed from their home and placed into the custody of the Massachusetts Department of Child Protective Services for two nights. There have never been any allegations against John Murphy or Tiffany Lane of child abuse or neglect.

On March 28, 2024, a Grand Jury returned a nine-count Indictment against the defendant. Counts 1-9 charged the defendant with Possession of Animals for Use in an Animal Fighting Venture, in violation of 7 U.S.C. § 2156(b), 18 U.S.C. § 49. On March 29, 2024, John was arrested by federal authorities and released on a $5,000 unsecured bond with interim conditions. A detention hearing was held on April 3, 2024, and John was released on the same $5,000 unsecured bond and additional conditions. On November 26, 2024, pursuant to a written plea agreement, the defendant tendered a guilty plea to the nine-count Indictment.

## II.  HISTORY AND CHARACTER OF THE DEFENDANT

### a.  *Childhood*

John Derving Murphy, born on August 11, 1973, was raised by his mother, Doreen, in the public housing projects in South Boston and Revere, Massachusetts, until the age of nine. His mother was unemployed and received public assistance. His father, separated from his mother, worked at General Electric, and would visit John on the weekends. His father contributed what he could to John's upbringing financially. But growing up John was never in abundance of anything. John was abused by his mother and other family members, being hit daily. He constantly felt like a burden to others, having to ask for needs he was not provided. At the age of nine, his mother passed away in their home. John called 911 as she died in his arms.

The passing of his mother was confusing for John, being so young and unaware of the reason for her death. Following her death, he went to live with his maternal grandmother, Marie LNU, who lived at the same public housing complex in Revere. Marie physically and emotionally abused John daily, even assaulting him with a pot of hot coffee. He stayed with her until she passed away four years later when John was thirteen. After her death, John was effectively on his own. He worked as a paper boy, mowing lawns, and doing whatever he could to earn money. For shelter he would stay with extended family members, going from house to house. As noted in Probation's report, John refers to himself as a "lost boy" during this time.

It was during this particularly vulnerable period of his already tumultuous childhood, after his mother's death, that the defendant's paternal uncle, also named John, came into life. His uncle grew up in a small, rural village in Ireland named Ballyconneely in West Connemara. This area is known for having a strong association with traditional Irish culture and contains most of the Connacht Irish-speaking Gaeltacht in Ireland, which is a key part of the identity of the region and is the largest Gaeltacht district in the country. As the defendant entered his most formative years in the absence of a father, the influence of this male figure had a profound impact on his development.

As a pre-teen, the defendant's uncle introduced him to the idea of dogs as animals of utility, as well as to dog breeding and preservation of certain breeds. His uncle also introduced him to the idea of dogs as animals of sport, such as the centuries old English and Irish tradition of using dogs in the hunting of foxes, badger, and other small game and vermin, as well as to the practice of dogfighting. John was recruited to participate with his uncle in these activities, which as a young boy without structure or guidance, he readily embraced. The defendant latched on to the sense of community and belonging which was offered by his uncle and the Irish identity.

b. *Criminal history*

During his teenage years and early twenties, the defendant had a few minor infractions. His criminal history is zero. The defendant has never been convicted of a violent crime. His record stops abruptly at the age of 26, which coincides with the birth of his first daughter. From that point until the filing of the indictments in the instant case at age of 51, the defendant has maintained a clean record.

c. *Family*

John Murphy is a father to four children. He shares three children with Renee McGregor, to whom he was married from 1999 to 2012. Their names are Madison Murphy, age 24; Avery Murphy, age 22; and Seamus Murphy, age 20. John shares a fourth child, Niamh Murphy, age 10, with his current partner of thirteen years, Tiffany Lane. John has remarkably close relationships with all four of his children and has been and continues to be the primary financial supporter of all of them. He is the primary financial contributor for all three of his eldest children's college educations, as well as the current provider of health insurance for all four of his children. He continues to make timely payments of $900.00 in monthly child support for his son to his former wife. Beyond providing financial support, John offers unwavering emotional and moral support to his children. He is always present when they need him, attending every school event, game, and milestone. His dedication and love are evident in the heartfelt letters his children have written in their support of him. Probation reports John stated he loves being a father and considers it the most significant accomplishment of his life.

The defendant's oldest daughter Madison graduated from Regis College with a degree in Nuclear Medicine and achieved Dean's List every semester. She is currently employed as a Registered Nurse at St. Elizabeth's Medical Center in Brighton. His second oldest daughter

Avery recently received her bachelor's degree from UMass Amherst in political science and plans to pursue a graduate degree in Nutrition. The defendant's son Seamus is currently attending Sacred Heart University where he plays Division 1 football on a scholarship and is pursuing a bachelor's degree in business. The defendant's youngest daughter, Niamh, is in the fourth grade, practices jiu-jitsu, and plays soccer and volleyball.

John lives with his partner Tiffany and their daughter Niamh at 944 East Washington Street, Hanson, Massachusetts. As noted in Probation's report, an inspection found that the defendant has owned the home since 2018, which is valued at $411,500, and he appears to live within his means. In Probation's interview with Tiffany, she describes John as the primary source of income for their family which allows her to work part-time while also being a caretaker for their young daughter. She states they appreciate the home they have and want to watch Niamh grow up in it. She also indicated that if John served a long custodial sentence, they would be forced to sell the residence (PSR paragraph 76).



John's son Seamus Murphy, the defendant John Murphy, his oldest
daughter Madison Murphy, his second oldest daughter Avery Murphy
and in front his youngest daughter Niamh Murphy

d. *Education and Career*

John Murphy earned his GED in 1991, afterward attending Fisher College in Brockton before deciding to pursue a trade. John has been a member of Local Union 1044 of the International Union of Painters and Allied Trades for 25 years. He was employed by the Laborers Union in Boston for 14 years as a Field Representative, Sergeant at Arms, and eventually Vice President, and is currently employed by Jackson Glass as a Glazier, where he has worked for the past 13 years. He works forty to fifty hours per week in this role, working overtime whenever possible so Tiffany can work part-time so she can be home to care for their daughter. John holds a leadership role within the company, assigned to their most difficult and high-profile projects. As stated by the owner of Jackson Glass in his letter to the Court, the defendant's ability to inspire morale in his colleagues and his "confident calm" while on the job makes him the most highly requested foreman by their customers. (Letter attached).

John holds a number of certifications and has had specialized training related to his employment as a union glazier, including OSHA 30, a rigging certification, a hoisting certification, a craning certification, a welding certification, multiple heavy equipment certifications, and an aerial lift certification.

e. *Community Involvement*

Beyond his career, John makes genuinely meaningful contributions to his community, dedicating his time to both mentorship and faith. He has been involved in coaching youth sports including boxing and jiu-jitsu for 25 years and currently volunteers six days a week as a jiu-jitsu instructor at the esteemed Daniel Gracie Academy in Hanover teaching children, including his own daughter. (See photo of his class attached.) Additionally, for the past ten years he has hosted a free class once every week in Framingham for law enforcement officers, members of the

military, and first responders to help them develop techniques that reduce the need for excessive force in the field. His commitment to his community and the lives of his children is also evident in his role as a volunteer coach for his daughter's soccer team in 2023, a season in which they won every game. In addition to his volunteer work, John is a devoted member of Bible Baptist Church in Hanson, where he has faithfully attended Sunday services since 2019.

The defendant is a pillar of support not only for his own family but for the families in his neighborhood. His neighbors describe him as exceptionally trustworthy—a dependable, go-to person who is always willing to lend a hand, especially to the elderly. He is the first to step up whenever help is needed, offering his time and effort without hesitation. His integrity and reliability are so well-regarded that neighbors entrust him with the keys to their homes and confidently place their children in his care, whether in his home, his yard, or even around his dogs. Numerous accounts highlight his immediate willingness to assist whenever a neighbor is in need.



John with his Jiu-Jitsu students at Daniel Gracie Academy (2025)

f. *Dog Breeding*

Mr. Murphy takes immense pride in his knowledge and ability to select for traits that produce lovable pets for families, which in fact, the defendant has received awards for. Mr. Murphy's 25 years of dog breeding has allowed him to unite many families with sweet, well-behaved, mild-mannered pets over the years which is evidenced by the multiple letters that attest to this. Attached are images of his daughter Niamh with such dogs, some of which were the nine pertaining to this case which were seized. The photos attest to their loving nature. The purpose of this section is that while animals were possessed in the context of dogfighting, there is another side of Mr. Murphy.

 













### III.    LETTERS OF SUPPORT

The defendant submits letters from family, friends, neighbors, fellow congregants, and work colleagues attached to this memorandum as Exhibit 1.

### IV.    BAITING SPORTS: A SOCIAL-HISTORICAL VIEW

John Murphy is acutely aware, accepts, and acknowledges that dogfighting is viewed as a particularly brutal and appalling activity. He himself has come to accept and acknowledge this. This section seeks to explore and answer the question of how and why someone would find themselves engaging in this activity.

a. *From Utility to Sport*

Dogfighting is a product of tradition and history, a leftover from when a period when it was both legally and socially acceptable as a popular way to accumulate power and wealth and to entertain the masses. Dogfighting has been found all over the world. To understand its evolution, one must first examine the view of animals as tools for human utility.

Animals have served practical purposes for humans since antiquity. They are used for food, clothing, and have historically been used as beasts of burden for hauling and transportation. Rhonda Evans and Craig Forsyth, in their essay "Entertainment to Outrage" (in *The International Review of Modern Sociology*), note that baiting dogs against other animals such as bulls and bears had been a common practice for centuries as it was believed to help tenderize the meat. In fact, in 17th-century England, it was illegal to slaughter a bull without first baiting it against a dog.

While baiting spectacles may have originated to serve practical functions, they quickly evolved from utility to sport. Bull and bear baiting were prominent spectator sports as early as

the 14th century across Europe. These activities eventually laid the foundation for dogfighting, which gained prominence in the 18th century (Evans and Forsyth).

b. *The Rise of Dogfighting in England*

While only becoming prominent in the 18th century, dogfighting is traceable back to Ancient Rome and Japan (Young 2018). American legal historians of dogfighting such as Hanna Gibson tell us that the modern-day version of the practice was initiated in 1835 England, where, beginning in the 17th century, the upper classes lent legitimacy to various baiting sports helping to popularize them. But with industrialization and urbanization in the 19th century, rural laborers who migrated to cities to become factory hands lacked the space and free days for baits with larger animals, shifting the focus of blood sports to dogfights which could be held indoors (Evans and Forsyth qtd. in Ortiz).

Initially it was the church that first opposed the practice, not on moral grounds, but because the events were held on Sundays, competing with church attendance. Theater owners also expressed concern, as these events began to draw larger crowds than theatrical performances (Evans and Forsyth). By the mid- to late-1800s, wealthy English shifted their focus from dogfighting to cockfighting, an older and more popular form of animal pit fighting.[1] Lacking the support of the wealthy, dogfighting became increasingly susceptible to legislative reform. The same elite class that had once helped define it as a socially acceptable form of entertainment later redefined it as offensive. This shift in societal norms marginalized those who continued to

---

[1] The practice of cockfighting is one of the oldest spectator sports on earth, dating back 6,000 years to ancient Persia. Famous military leaders throughout time including Alexander the Great and George Washington were reputedly cockfighting enthusiasts, as were many generations of British royalty from the 12th to 19th centuries. Cockfighting remains especially popular in countries such as Belgium, France, Spain, Mexico, the Philippines, Indonesia, Puerto Rico, Guam, the United States and Haiti (Young 2018)

participate in dogfighting, particularly working-class individuals, by labeling the practice as illegal and socially unacceptable.

c. *Dogfighting in the U.S.*

The practice was transported to the U.S. by the British in the 19th century and was not only a legal activity, but became part of American culture, endorsed by the United Kennel Club, and prominent in east coast cities like New York and Boston. A dogfight is even recorded as the main form of entertainment of the Democratic Convention of 1881 which was attended by 300 enthusiasts (Matz qtd. in Evans and Forsyth). In the same year, the Ohio and Mississippi railroads advertised special fares to a dogfight in Louisville. The practice would only be outlawed in all states by 1976 and did not begin to receive serious law enforcement attention until recently (Gibson 7).

d. *Shifts in Public Perception of the Human-Animal Relationship*

Dr. Kevin Young, a sociology professor at the University of Calgary, notes in his chapter entitled "The Animal-Sport Complex" in *The Routledge Handbook on Deviance* (2018), "It is clear that we live in a time of growing sensitivities to how we 'engage' animals…as companions, as 'game', as food, as 'athletes' to observe, support and bet on, and as sources of mass entertainment." Dr. Young argues, because of its involvement of humans, the relationship between animals and sport is fundamentally a social one and necessitates the introduction of a sociological perspective, which he suggests the current narrative is desperately lacking. "The discipline of sociology and its researchers play a leading role in public knowledge about a broad panorama of social issues that are sensitive, controversial or socially urgent and impacting. Yet, the complicated role that animals occupy in our lives represents a glaring exception."

Consequently, almost all of the extant work on the relationship between humans and animals comes from other disciplines, and therefore societal view is shaped by limited frameworks that fail to fully address the complexities of this relationship, often overlooking critical social, cultural, and ethical dimensions.

Editor of the Journal of Society and Animals, Arnold Arluke, predicted this situation decades ago. "It is ironic that so little research interest has been paid to studying the human experience of them when animals occupy such a commanding presence in society…as concerns mount and consciousness changes…over the proper use of animals, *the findings of researchers will be absolutely crucial* to make what is often an emotionally charged and highly polarized debate more reasoned and informed" (Arluke qtd. in Young) [emphasis added].

According to Young, at the center of this debate is the tricky question of how humans should treat their animal companions, and "whether the techniques of neutralization that have conventionally been used to rationalize risk, pain, death or consumption and entertainment of various kinds are compelling as they once were in a dynamic contemporary culture apparently increasingly concerned with the use, and abuse, of animals."

Because we live in a period of shifting social tolerance and normativity of our use of animals, our collective societal view on the subject of animals in sports has been particularly inconsistent. While outwardly brutal animal sports have been pushed underground overtime, such as dogfighting and cockfighting, society as well as researchers have been slow to turn their attention to those spectator-based pastimes in which animals suffer neglect and abuse under the radar such as greyhound racing, rodeo, and horse races. "Although there seems to be a heightened sense of public contempt in many countries toward the outwardly cruel treatment of animals in eating cultures (such as general eating habits, restaurants and televised cooking

19

shows) or entertainment contexts (such as zoos or circuses), we rarely consider how animals may be enmeshed in wider formations of sports-related deviance and violence" (Young 2018).

The lack of or delayed legislative response to other harmful animal-based sports reflects this overlooked mistreatment and underscores the broader inconsistencies in how we perceive and treat animals generally and in sport. Today a traditional bullfight in Spain, Portugal and France, (which ends in the slaughtering of the bull) is still an enormously popular (and legal) spectator event and deeply encoded with pageantry, ritual and custom. In fact, bullfighting still exists in some states in the U.S., albeit a less outwardly violent form. Greyhound racing, an example of a legal, widespread and accepted animal sport in the U.S., is slowly being recognized as a blood sport by researchers on account of the bodies and lives of racing greyhounds being subjected to a variety of forms of control and constraint, which leads many of the animals to experience discomfort, stress, and death. Perhaps more than any other animal setting, the institutionalized abuses inherent in horse racing and other equine sports have also been widely studied. Berber and Young's 2013 critical review of horse participation in the world-famous Calgary Stampede cites numerous cases of abuses in rodeo and other horse sports. Despite the attention garnered by controversial field and blood sports, less explicitly abusive sports are increasingly coming under the purview of sociological investigation.

While the traditionally English blood sports of foxhunting and hare coursing have been subject to legislation, they remained publicly legitimate until quite recently, with British and Scottish governments only banning open coursing through national legislation as late as 2002. In Northern Ireland and in the United States, similar attempts of anti-coursing lobbyists have been unsuccessful in convincing federal legislators to criminalize this practice and remained unlegislated in the U.S. until 2006.

e.  *"Folk Crime" and The Interpretation of Cultures*

Dogfighting falls into a category commonly referred to as "folk crime" by criminologists, as cited by Evans and Forsyth. These laws have little moral restraint associated with them and although their violation is not generally approved, such crimes are relatively numerous and differentially treated in the legal process. The violation of gambling, traffic and hunting and game laws and woods burning are examples of folk crimes.

They go on to argue that deviant behavior, particularly the deviant behavior that is categorized as "folk crime," is relative to time periods, cultures, and societies. "Acts are not intrinsically deviant. They are judged in various ways. Moral meanings and ensuing labels of undesirable, deviant, or condemned are socially constructed. Ideas of right and wrong come to be defined over time with in specific cultural and social contacts. Moral meanings arise out of specific historical structures and processes. Prohibition and the criminalization of marijuana are such notable models. Many factors play a role in the construction of moral meanings, but theorists of deviance suggest two which are significant: Campaigns of moral entrepreneurs to discredit an activity, and a significant differential in the relative power and social status of those who engage in the activity and those who condemn it."

Clifford Geertz's world-renowned 1973 anthropological essay on the Balinese cockfight from his book *The Interpretation of Cultures* is particularly relevant to this discussion, as it serves as a foundational work on understanding and evaluating cultural practices.

Introducing the concept of "deep play," Geertz explains that the stakes, both financial and symbolic, are so high that the event transcends mere entertainment. The loss of a cock in this context carries profound implications for one's social status, identity, and community connections. He illustrates that, while these events may appear to be mere gambling to the

uninformed spectator, they are actually infused with meaning related to status, masculinity, and the Balinese worldview, showing how important it is to understand and interpret cultural practices within their specific contexts and recognizing that seemingly simple or antiquated activities can carry profound social significance that broader, outsider viewpoints often fail to grasp.

## V.    FACTORS THAT WARRANT A SENTENCE OUTSIDE THE ADVISORY GUIDELINE SYSTEM

Pursuant to 18 U.S.C. § 3553(a)(l) through (7), the following factors are to be considered in imposing a sentence: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to satisfy the statutory purposes of sentencing; the kinds of sentences available; the applicable guidelines; pertinent Sentencing Commission policy statements; the need to avoid unwarranted similar conduct; and the need to provide restitution.

As stated in their report, the Probation Office "believes a downward variance may be warranted in light of 18 U.S.C. § 3553(a) factors, such as, family ties and responsibilities, lack of youthful guidance, employment record, and early acceptance of responsibility," and pursuant to this Court's Amended Procedural Order, the defendant is moving for a non-guideline sentence.

18 U.S.C. § 3553(a)(6) also directs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Sentencing must be proportional, and courts have discretion to impose below-guideline sentences when appropriate.

Judiciary Sentencing Information (JSIN), according to Probation, does not provide reliable insight as to sentencing in the instant case, since "there was an insufficient number of defendants" meeting the same criteria as the defendant. But sentencing courts have consistently imposed significantly below-guideline sentences in cases involving more serious conduct than what the defendant has pled to in this case. For example, in USA v. Derek Garcia 1:22-cr-00154 (in the Eastern District of Virginia), the defendant tendered a plea of guilty to Dogfighting Conspiracy and on March 3, 2023, received a sentence of 10 days incarceration and 3 years supervised release. In USA v. Mark Rodriguez 1:23-cr-00176 (also in the Eastern District of Virginia), the defendant also pled guilty to Dogfighting Conspiracy and on July 2nd of last year, 2024, received a sentence of 14 days incarceration with 3 years supervised release. In USA v. Charles Davis 1:23-cr-00176 (also in the Eastern District of Virginia), the defendant pled to Dogfighting Conspiracy and received a sentence of 60 days with 3 years supervised release. In USA v. Karl Courtney 6:09-cr-00080-LED-JDL-1 (in the Eastern District of Texas), the defendant pled to Sponsoring or Exhibiting an Animal in an Animal Fighting Venture, and Aiding and Abetting, and in 2010 received a period of probation as well as restitution. In USA v. Jerry Chism 6:09-cr-00080-LED-JDL-2 (also in the Eastern District of Texas), the defendant also pled to Sponsoring or Exhibiting an Animal in Animal Fighting Venture, and Aiding and Abetting, and in 2010 received a sentence of probation, as well as a $2,000 fine.

This Honorable Court presided over USA v. John Cafiero, No. 1:17-cr-10093-WGY, a case involving bluefin tuna where the government alleged an "entire international industry depends on their survival." In that case the defendant was charged with Conspiracy and Falsifying Wildlife Records. The government recommended a sentence at the low-end of the guideline range of 18-24 months. This Honorable Court sentenced the defendant to three years

probation with standard and special conditions. It is respectfully suggested that this Honorable

recognized and took into account that the defendant, like Mr. Murphy, was an exceptionally

hardworking father of a young child for whom he was the primary financial supporter.

## VI.    SENTENCING RECOMMENDATION

Pursuant to the plea agreement, the parties agree, based on a total offense level of 13, and

a criminal history category 1, the correct guideline provision is 12-18 months. Given his very

challenging upbringing, the responsibility he has shown to his family as well as his contributions

to his community, the defendant is moving for a non-guideline sentence of an extended period of

Home Detention with a curfew for work in order to support his family. In the alternative, should

this Honorable Court deem a guideline sentence as appropriate, the defendant notes that the

applicable guideline range is in Zone C of the Sentencing Table. Pursuant to s§5C1.1(d), the

minimum term may be satisfied by a sentence of imprisonment that includes a term of supervised

release with a condition that substitutes community confinement or home detention, according to

the schedule in subsection (c), provided that at least one half of the minimum term is satisfied by

imprisonment.

Citations

Evans, Rhonda D., and Craig J. Forsyth. "Entertainment to Outrage: A Social Historical View of Dogfighting." *International Review of Modern Sociology* 27, no. 2 (1997): 59–71.

Geertz, Clifford (1973). "Deep Play: Notes on the Balinese Cockfight". In *The Interpretation of Cultures* (pp. 412–453).

Gibson, Hanna. "Detailed Discussion of Dog Fighting." Michigan State University College of Law: Animal Legal and Historical Center, 2005.

https://www.animallaw.info/article/detailed-discussion-dog-fighting.

Ortiz, Francesca. "Making the Dogman Heel: Recommendations for Improving the Effectiveness of Dogfighting Laws." *Stanford Journal of Animal Law and Policy* 3 (2010).

Young, Kevin. "Toward a Less Speciesist Sociology of Sport." *Sociology of Sport Journal* 31 (2014): 387–401.

Young, Kevin. "The Animal-Sport Complex: Shifts in Public Perception and Tolerance." In *Routledge Handbook on Deviance*, edited by Stephen E. Brown and Ophir Sefiha. New York: Routledge, 2018.

Respectfully Submitted,
JOHN MURPHY
By his attorney

/s/ James E. McCall
James E. McCall
107 Union Wharf
Boston, MA 02109
(617) 720-2900
BBO# 327365
mccall_attorney@yahoo.com

25

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that a true copy of the above document was served upon the attorney of record for each party and upon any party appearing pro se by complying with this Court's directives on electronic filing.

Dated:    <u>April 4, 2025</u>          Signed: <u>/s/ James E. McCall</u>